The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Shuping. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties of their representatives, or amend the Opinion and Award.
This initially admittedly compensable matter, which was subject of prior Industrial Commission Awards of temporary total and permanent-partial disability, was heard in part by Deputy Commissioner Shuping on 18 February 1994 in Raleigh upon the primary issue of whether plaintiff had since sustained a substantial change of condition pursuant to the provisions of G.S. § 97-47 entitling him to an additional award of compensation benefits. Prior to hearing the parties entered into a Pre-trial Agreement, which is hereby incorporated by reference as if fully set out herein and where they agreed to a number of jurisdictional and other factual stipulations. By subsequent Order thereof the parties were allowed a reasonable period of time to obtain, either by deposition at defendant's expense or additional stipulated report, the medical evidence necessary to complete the record as testimony from defendant-employer's well as additional testimony from defendant-employer's rehabilitation counselor, Katherine Wickizer, and one of defendant-employer's unavailable lay witnesses, who it no longer desired to depose and have since not only taken the depositions of Drs. Miller and Vernick and Katherine Wickizer as well as agreed to submit voluminous medical records; but have submitted Statements of Contention. Each of the Industrial Commission's prior awards are hereby incorporated by reference as if fully set out herein.
Based upon the competent evidence adduced at the hearing, the undersigned makes the following additional
FINDINGS OF FACT
1. Plaintiff is a 41 year-old married male who did not have an antecedent history of back problems before the February 23, 1990 date in question. He initially dropped out of school after finishing the ninth grade, but subsequently obtained his GED or so-called high school equivalency certificate. Since obtaining his GED plaintiff has not received any type of further formal education. In 1970 he entered the Army and was subsequently stationed in Germany where he worked as a supply clerk.
Prior to becoming employed by defendant Phillips Fiber Corporation he had done construction work and worked as a material handler, heavy equipment operator and truck driver responsible for loading and unloading his vehicle, which involves physical labor and is the only type of work he has ever done. Plaintiff has never done the type of sedentary work required by the permanent back injury giving rise hereto.
2. Approximately ten years ago plaintiff became employed by defendant Phillips Fibers Corporation as a spinner machine operator. He was subsequently promoted to second and then first operator before being transferred to the maintenance department a year and a half to two years prior to his back injury. In the maintenance department plaintiff was responsible for the maintenance and repair of all types of machinery and mechanical equipment such as pumps, motors and winders requiring him to lift up to 100 pounds as well as climbing, entering confined spaces, stooping, bending, pushing and pulling, which he can no longer do because of his permanent back injury.
3. Prior to the same injury plaintiff operated his own building and remodeling business known as S.L. Peace Building and Remodeling and did work on the side, including work for co-employee's at Phillips Fibers. He also had a woodworking shop at his residence and occasionally made furniture and other items for sale.
4. On February 23, 1990 plaintiff sustained the admittedly compensable back injury giving rise hereto when he fell out of a swivel chair landing on his back on the premises cement floor resulting in a right-sided disc herniation at the L4-L5 level of his lumbosacral spine.
5. He was initially treated for the same injury by Dr. Thorpe, but subsequently referred to an orthopaedic surgeon, David C. Miller of Tarboro. In April of 1990 when his condition did not improve with continued conservative treatment Dr. Miller performed corrective surgery in the nature of rightsided hemilaminectomies of the L4-L5 and L5-Si levels of plaintiff's lumbosacral spine and a discectomy at the lower level for the resulting disc herniation he sustained on February 23, 1990.
6. Following surgery plaintiff's condition initially improved and he was able to return to work for defendant-employer in late September or early October, 1990.
7. On or about October 4, 1990 plaintiff ultimately reached maximum medical improvement and/or the end of the healing period from and following the injury by accident giving rise hereto and the initial April 1990 corrective surgery necessitated thereby, at which time he retained a twenty (20) percent permanent-partial disability of the back from the same injury that was subject of the Industrial Commission's last award herein and (plaintiff's) resulting Form 31 Application for Lump Sum Approval of the same award was subsequently approved by the Industrial Commission on December 20, 1990 contemporaneously with the Industrial Commission's approval of the underlying Form 26 Agreement to compensate plaintiff for his permanent-partial disability.
8. After returning to work in late September or early October, 1990; however, plaintiff experienced progressively worsening back and right hip and leg pain as a result of suffering a recurrent right-sided disc herniation at the same L5-Si level of his lumbosacral spine injured on February 23, 1990=, which was a resulting risk of his earlier back injury and corrective surgery necessitated thereby, and his symptoms became totally incapacitating on April 23, 1991 forcing him to stop working.
9. On May 28, 1991 defendant-employer entered a Form 26 Supplemental Memorandum of Agreement as to payment of compensation agreeing to pay temporary-total disability benefits when plaintiff sustained a substantial change for the worse in his condition and again became totally disabled by his February 23, 1990 back injury on April 23, 1991 and submitted the same agreement to him for his signature.
Plaintiff, however, refused to execute the involved agreement based on the fact that certain portions were blank and his disagreement with the compensation rate because of having received a substantial wage increase since his back injury, which he mistakenly assumed would increase his weekly compensation benefits, but is contrary to the specific statutory provisions of G.S. § 97-2(5) that defines the average weekly wage to mean "the earnings of the injured employee in the employment in which he was working at the time of injury during the period of 52 weeks immediately proceeding the date of the injury . . . ."
10. Defendant-employer on the mistaken assumption that the same agreement had been approved by the Industrial Commission resulting' in a binding award obligating it to pay compensation benefits commencing as of April 23, 1990 because of plaintiff's substantial change for the worse in his condition continued to pay weekly compensation benefits during the period from April 23, 1991 until suspending benefits in November of 1993 after learning that the Industrial Commission had never entered a binding award requiring its approval to stop payment of benefits.
11. Defendant-employer alleges that plaintiff did not file his change of condition claim within two years of the final (and in fact only) payment of compensation benefits under the Industrial Commission's last award of permanent-partial disability. The two year statute of limitations contained in G.S. § 97-47 is a technical legal defense that defendant-employer has the burden of establishing including as part thereof the date on which plaintiff received his final payment of compensation under the award under review and that he failed to file his claim for additional compensation based on a substantial change of condition within two years thereafter. In the instant case there is absolutely no evidence as to the exact date when plaintiff received his final, and in fact only, payment of compensation under the Industrial Commission's last award of permanent-partial disability benefits other than it would have been after December 20, 1990 when the Industrial Commission contemporaneously approved plaintiff's Form 31 Application for Lump Sum payment and of which the undersigned takes judicial notice because it involved judicial action of the Commission in approving the same request. There is further absolutely no evidence that plaintiff did not file his change of condition within two years of the final payment of compensation under the Industrial Commission's last award of permanent-partial disability benefits nor is there any evidence exactly when plaintiff did ultimately file the same claim. Neither of the Form 33 Hearing Requests that he has filed in this case have been offered in evidence.
12. Even assuming arguendo that the undersigned could take judicial notice of either hearing request or the fact that a review of the Commission file would indicate that plaintiff did not file his change of condition claim within two years of receiving his lump sum award of permanent-partial disability benefits, defendant-employer is estopped from pleading the provisions of G.S. § 97-47 prior to November of 1993 because it continued to pay plaintiff weekly compensation benefits during the period from April 23, 1991 until terminating those benefits in November of 1993 under the circumstances described in the above Findings of Fact.
13. On May 29, 1991 as a result of the recurrent disc herniation sustained from his February 23, 1990 back injury plaintiff underwent further corrective surgery involving a right-sided hemilaminectomy and discectomy at the L5-Si level of his lumbosacral spine as well as a fusion at that level and the L4-L5 level above with Simmons Plates, an iliac bone graft and autogenous bone graft designed to stabilize his back.
14. Unfortunately, however, the involved surgery did not significantly improve plaintiff's condition; but rather, he continues to experience chronic and incapacitating back, hip and leg pain. Initially Dr. Miller attempted to treat plaintiff's intractable pain conservatively with different types of medication, a polyprophylene body jacket and a program of walking before referring him to a local pain management program at Nash Day Hospital. As part of the same program plaintiff was provided a TENS unit for his pain and underwent physical therapy involving progressive flexibility strengthening and conditioning preliminary to undergoing a work-hardening program designed to enable him to return to his prior employment as a maintenance mechanic; but because of his chronic pain will never be able to return to that type of medium to heavy work required by his maintenance mechanic's job and as a result was not a candidate for the premises work-hardening program.
15. On or about March 11, 1992 plaintiff ultimately reached maximum medical improvement and/or the end of the healing period from and following the further corrective surgery necessitated by the substantial change for the worse in his condition from the involved February 23, 1990 back injury, at which time he retained an additional five (5) percent permanent-partial disability of the back as a result of the same injury or an overall twenty-five (25) percent permanent-partial disability therefrom, including the twenty (20) percent that was subject of the Industrial Commission's last award.
16. Because plaintiff was understandably not interested in undergoing a re-exploration of the fusion mass or additional surgery Dr. Miller referred him to Greenville Regional Rehabilitation Center for pain control and in the Summer of 1993 he came under the primary care of a psychiatrist there, Dr. Sanford H. Vernick. In order to provide relief of his chronic pain Dr. Vernick has not only attempted a conservative course of treatment involving various medications, including Pamelor for sleep and an anti-depressant, Prozac; but referred him for psychological and psychiatric evaluations and treatment because of his depression; however, plaintiff has been refractory to all forms of treatment.
17. As a result of the situational stress and chronic intractable pain from his permanent back injury and difficulty coping with it; plaintiff became severely depressed and withdrawn requiring that he be placed on the previously described anti-depressant Prozac as well as Pamelor for sleep and undergo psychological and psychiatric evaluations and treatment based on the same psychological problems. He does not experience a significant amount of functional overlay nor is there any evidence of conscious or unconscious malingering upon psychological testing.
18. As previously stated, as a result of his permanent back injury plaintiff is now unable to return to his regular maintenance mechanic's job or to the type of physical labor he had always done before; but rather, is only capable of less than sedentary work that does not require him to sit, stand or walk for more than short periods without the ability to change positions, to lift in excess of seven pounds or to bend, stoop or climb as indicated by the most recent functional capacity evaluation he underwent. Defendant-employer has not offered to provide plaintiff with the type of less than sedentary work required nor is there any evidence that the same work is available for someone of plaintiff's age, education, background and work experience having the physical limitations he does much less that he can obtain it in an open and competitive labor market.
19. In December of 1992 defendant-employer engaged the services of a rehabilitation counselor, Katherine Wickizer, to perform a vocational assessment to evaluate plaintiff's current status as well as to assess his current medical needs, who initially met with plaintiff and his wife on December 30, 1992 and subsequently accompanied him to his January 14, 1993 appointment with Dr. Vernick. As a result of her evaluation the involved rehabilitation counselor not only discussed the possibility of an inpatient admission to a pain clinic with plaintiff, which he was not amenable to undergoing; but an evaluation by another orthopaedic surgeon, Dr. William Lestini, to determine whether there is anything further that can be surgically done for his condition, which plaintiff ultimately did not undergo until a year later on February 7, 1993. Ultimately on March 22, 1993 the same rehabilitation specialist recommended that the file be closed because she had received no response to her recommendations since last talking with plaintiff's wife on February 19, 1994. In the interim she had approached defendant-employer about a potential job analysis, but was never able to arrange one before closing the record.
20. Approximately two and a half weeks prior to the scheduled hearing on February 18, 1994 Katherine Wickizer reopened her file at defendant-employer's request by not only setting up the appointment for plaintiff to be re-evaluated by Dr. Lestini on February 7, 1994; but completed a transferable skills analysis and labor market survey to determine whether there were potentially suitable jobs available that not only met plaintiff's level of skill, but physical limitations. At this point, however, Katherine Wickizer has not even looked at placement of plaintiff in a job nor asked him to look for a job; but rather, is still attempting to resolve his medical situation to determine whether there is anything that can be done to improve his intractable pain and concurrently improve his ability to function. For this same reason Katherine Wickizer arranged for plaintiff to be evaluated on February 7, 1994 by Dr. Lestini, who has made several possible recommendations regarding further diagnostic testing and treatment, including surgery, which plaintiff is currently considering and as part thereof has requested a second opinion by another physician; however, in view of the fact that plaintiff has already twice undergone corrective surgery that did not improve his chronic pain, the Industrial Commission would unlikely require him to undergo additional surgery over his objection in the absence of the type of medical evidence found in the Watkins vs. City of Asheville case, (99 N.C. App. 302 (1990)).
When the involved rehabilitation counselor is in a position to begin job placement; she would have to perform a job analysis of any potential employment to determine whether it is suitable for plaintiff and then have the particular job approved by his physician, which has not yet even occurred in this case.
21. As previously stated, prior to the time of his injury plaintiff had his own building and remodeling business known as S.L. Peace Building and Remodeling doing the same type of work on the side and also made furniture and other items in the woodworking shop at his residence for sale.
In the late Summer and Fall of 1992 plaintiff submitted a bid or bids for or otherwise agreed to do certain maintenance and repair work on several mobile homes in a trailer park owned and operated by his wife's aunt, Joyce Pridgen. The total value of the work according to Joyce Pridgen was less than $1,000.00. Although plaintiff may have submitted a bid or bids for or agreed to do the same work; the majority of the actual labor involved was performed by his wife, his brother, Timothy Peace, his neighbor, Jim Long, his son, Stephen Peace, Jr., and his in-laws, Reginald Medford and Son, who had their own construction business, which is consistent with what plaintiff told defendant-employer's private investigator when he was approached about submitting a bid on a job building a garage for the same investigator and told him that he would be unable to do the job himself because of his disabling back injury and could not find anyone else to do it. Although to the extent physically able plaintiff did attempt to assist in the same maintenance and repair work; he never engaged in any type of sustained physical labor for appreciable periods of time nor were the things that he attempted to do reflective of his having any wage earning capacity because of the temporary and limited nature of the work involved. Further, the limited activities that plaintiff actually did during the maintenance and repair of the same mobile homes are the ones he was observed in engaging in by defendant-employer's private investigator or by his neighbors. were not wholly inconsistent with the limitations of his permanent back injury and resulting inability to engage in the type of sustained physical activity necessary to perform the type of physical labor he always had as opposed to engaging in limited physical activities for short periods of time and in particularly activities he had always enjoyed doing such as attempting to work in his garden or doing some limited woodworking work or tending a fire in his yard, which primarily consisted of him sitting in a chair and occasionally getting up to place scrap lumber on the fire that did not appear to weigh very much or to rake around the fire.
At most the videotapes of his activities on the two occasions filmed showed in one less than a two minute clip during which he bent over a couple of times in what appeared to be a rather stiff and non-fluid manner to pick up pieces of scrap lumber and put it on the fire and then sat back down; while in the other 10 to 12 minute clip of activity he merely sat in a chair by the fire drinking what appeared to be a beer and got up one time to rake around the fire for an approximate two minute period before sitting back down.
22. Although at the request of plaintiff's counsel defendant-employer submitted a Form 22 Wage Chart in order that his client's appropriate average weekly wage could be determined; the same Wage Chart is inadequate because it does not show the actual days worked during the year prior to the involved injury and, in particularly, whether there were periods when more than seven consecutive days were lost from work requiring them to be deducted from the 52 week period; but rather, (the Wage Chart submitted) only shows gross monthly earnings. If the gross monthly earnings were used only and it was assumed that plaintiff at no time lost more than seven consecutive calendar days from work during the year preceding his injury; it would engender an average weekly wage of $311.07; however, because of the variable nature of his monthly earnings during this same year no such presumption can be made. In fact, a deduction of as little as 15 days would result in a comparable average weekly wage to the one on which the Industrial Commission's original award was based.
* * * * * * * * * * * * *
The foregoing stipulations and findings of fact engender the following
CONCLUSION OF LAW
Since the Industrial Commission's last award of permanent-partial disability benefits plaintiff has sustained a substantial change for the worse in his condition from his February 23, 1990 back injury resulting in his again becoming totally disabled thereby on April 23, 1991 entitling him to compensation at a rate of $215.65 per week from April 23, 1991 to the scheduled hearing date and thereafter continuing at the same rate so long as he remains totally disabled, subject to defendant-employer being entitled to a credit for the weekly compensation benefits paid during the period from April 23, 1991 until those same benefits were suspended in September of 1993 as well as the 31 2/7 week balance of the prior award of permanent-partial disability that would have otherwise been due after plaintiff again became totally disabled by his permanent back injury on April 23, 1991 had the permanent-partial disability benefits not already been paid on a lump sum basis, which effectively resulted in plaintiff receiving both temporary-total and permanent-partial disability benefits for the same back injury during the 31 2/7 week balance of the award of permanent-partial disability benefits due after April 23, 1991, which he was not entitled to because his permanent-partial disability benefits should have been temporarily suspended when he again became totally disabled by the same permanent back injury, but had already been paid in lump sum and could not be.
* * * * * * * * * * * * * *
The foregoing stipulations, findings of fact and conclusions of law engender the following
AWARD
1. Defendant shall pay plaintiff, on account of his continuing total disability, compensation at a rate of $215.65 per week from April 23, 1991 to the scheduled hearing date and thereafter continuing at the same rate so long as he remains totally disabled, subject to a credit owing for the weekly compensation benefits defendant paid during the period from April 23, 1991 to November of 1993 when those same benefits were stopped as well as the 31 2/7 weeks overpayment of permanent-partial disability benefits after plaintiff became totally disabled on April 23, 1991 and began receiving weekly compensation benefits for his resulting disability. Such compensation as has accrued hereunder shall be paid in lump sum, without commutation.
2. As with both of the credits described in the above award there is no substantial compensation presently due plaintiff from which to award a reasonable attorney fee for his counsel, defendant shall forward every fourth compensation check hereafter payable from plaintiff's continuing total disability to his counsel for his fee.
3. To the extent the same are reasonably designed to tend to effect a cure of, provide needed relief from and/or lessen the period of disability associated therewith defendant shall pay all reasonable and necessary medical expenses incurred by plaintiff as a result of his substantial change of condition giving rise hereto when bills for the same are submitted on proper forms, Industrial Commission for Commission.
4. Defendant shall bear the costs.
 S/ _________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ _________________________ BERNADINE S. BALLANCE COMMISSIONER
S/ _________________________ COY M. VANCE